# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                       Case No. 19-CR-162

**WILLIAM BRADFORD**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant William Bradford with unlawful possession of a firearm, see 18 U.S.C. § 922(g)(1), after police officers seized a gun during the execution of a search warrant for a motel room he occupied. Defendant filed a motion to suppress and request for a Franks hearing,[1] arguing that the warrant affidavit contained false and misleading statements, and that the warrant was based in part on information officers obtained by illegally entering his room before applying for the warrant.

The magistrate judge handling pre-trial proceedings in this case acknowledged problems with the affidavit and with the manner in which the police conducted themselves in entering the room but nevertheless concluded that, with these irregularities set aside, the information properly included in the affidavit still established probable cause. He thus denied a Franks hearing and recommended that suppression be denied. Defendant objects to the recommendation. My review is de novo. Fed. R. Crim. P. 59(b).

---

[1] See Franks v. Delaware, 438 U.S. 154, 155-56 (1978) ("[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.").

## I. FACTS AND BACKGROUND

As indicated, the magistrate judge denied a Franks hearing. I draw the following facts from the magistrate judge's report and the parties' submissions, which include the warrant affidavit and several police body camera videos of the events at issue.

Police investigating drug activity at a Milwaukee motel saw Christopher Hendon exit room #9 and drive away. Officers attempted to conduct a traffic stop, but Hendon failed to pull over and led the police on a chase. After the pursuit ended, officers arrested Hendon and searched his vehicle, locating a gun, drugs, a scale, and a cell phone. During a search of Hendon's person, officers found a key with tag #9, and employees of the motel said Hendon was responsible for room #9. (R. 27-1 at 4 ¶¶ 5, 9; R. 17 at 2; R. 12 at 2-3.)

Officers applied for a warrant to search room #9, stating, in pertinent part:

> 7. That affiant conducted follow-up investigation at the address of 7012 W Appleton Ave [the motel], when officers observed multiple individuals outside of the location. A citizen informant who was previously observed attempting to conceal an item and conducting a hand to hand exchange with another individual provided officers with .82 grams of cocaine base and described the individual who provided him/her with the narcotics. The citizen informant described the individual as "Bee" who was a black male, bald, tall, wearing a gray jumpsuit and a "Steelers" knit cap that was currently located in the Room# 9 at the address of 7012 W Appleton Ave. The citizen informant stated he/she consistently observes the same individual possessing a firearm in "Bee's" waistband. Affiant is aware that the same room number the citizen informant was providing to officers is the same room number the affiant initially observed Christopher Hendon exit.
>
> 8. That affiant attempted to locate the suspected narcotics dealer at the address of 7012 W Appleton Ave Room # 9 when William T Bradford came to the door. William Bradford allowed officers to conduct a sweep of the location for additional occupants. Officers placed William Bradford in custody, who matched the specific description of the narcotics dealer and maintained standing in Room # 9 at the address of 7012 W Appleton Ave.

(R. 27-1 at 4 ¶¶ 7-8.)

As the magistrate judge noted, these statements are inconsistent with the information

2

recorded on the officers' body cameras.² Rather than a single "citizen informant," officers actually obtained information from two women at the motel. Officers encountered the first ("C.O.") in Room #6, stating they were looking for a "thin white chick"; C.O. said they were looking for Samantha, who was in Room #9. The officers noticed C.O.'s hand was closed, and when she refused to show them what she was holding they forcibly opened her hand, causing her to drop a rock of suspected crack cocaine; she did not simply "provide" officers with the drugs, as alleged in the affidavit. The officers handcuffed C.O. and aggressively questioned her, accused her of lying, and threatened to take her in, but said that she could avoid arrest if she answered their questions "right." C.O. said that "Flavor" or "Flav" controlled Room #9, that she heard Flavor had been in a chase with the police, and that she got the rock from a man in Room #9 named William, who she thought was Flavor's brother. (R. 17 at 3-4; R. 12 at 3-6.)

The officers spoke to a second woman (A.E.) outside the motel. She told the officers she had a pending case for heroin possession. She also appeared to indicate that she had previously obtained drugs from "Flavor" in Room #9. She further mentioned someone named "Bee," who possessed a handgun. The stated that she had just recently met this man, so she could not have "consistently" seen him with a gun, as alleged in the affidavit. (R. 17 at 3-4; R. 12 at 6-7.)

In addition to apparently creating a "composite" informant, the affidavit included no information about the credibility of the informants. Nor did it set forth the circumstances of the police encounter, in which the women were accused of lying but told that they could avoid

---

²The officers' discussion with C.O. in Room #6 is mostly intelligible, but the discussion with A.E., which took place outside, is mostly unintelligible due to the wind. (Ex. 3-5.) The interaction with defendant in and around Room #9 is mostly intelligible. (Ex. 6-7.)

3

arrest if they gave the police information. (R. 17 at 4; R. 12 at 10.)

Regarding the entry into the room, the officers repeatedly banged on the door and shouted for the occupant to open, telling him they were there to check on the welfare of Samantha and could not leave until they checked the room for her.[3] While they banged on the door, one of the officers said, apparently jokingly, "You hear that? Is somebody yelling for help?" (R. 17 at 5.) Defendant eventually opened the door, indicating that Samantha was not there but allowing the officers to check for her. After the officers confirmed no one else was present, defendant asked the officers to leave, but they refused, instead questioning him about drugs and guns in the room. Defendant telephoned Samantha, who apparently told one of the officers she was alright, but the officers still did not leave. The officers asked defendant for consent to search the room and when he refused they arrested him and indicated they would apply for a warrant. (R. 17 at 4-5; R. 12 at 7-9.)

The magistrate judge found that, despite the misstatements in the affidavit and the officers' troublesome conduct in entering and remaining in the room, suppression was not appropriate. (R. 17 at 5.) Specifically, he concluded that the statements of the informants were not necessary to the probable cause determination, so any misrepresentation or omission regarding the informants did not undermine that showing; similarly, the search warrant was not based on any observations the officers made in entering the room; the information about Hendon's drug trafficking, standing alone, sufficed. (R. 17 at 6.) The magistrate judge found that the quantity and variety of drugs found in Hendon's vehicle, along with the digital scale,

---

[3] The video shows that the officers initially asked about a "chick" named "Amanda." After banging on the door for a few minutes, they said they were there because somebody called concerned about "Samantha."

4

cash, and firearm, all strongly supported the inference that Hendon was selling drugs. The affidavit also connected Hendon to Room #9: he was seen leaving the room immediately before his arrest; he was found in possession of an apparent key to the room, suggesting that he intended to return; and hotel staff indicated that he was responsible for the room. The magistrate judge noted that while it was possible Hendon confined his illegal activities to the vehicle, probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity. (R. 17 at 8.) The magistrate judge therefore denied defendant's request for a Franks hearing and recommended the motion to suppress be denied. (R. 17 at 9.)

## II. DISCUSSION

Defendant objects to the recommendation on two grounds. First, he asserts that there was not probable cause to believe evidence of drug trafficking would be found in Room#9. Second, he argues that even if there was probable cause based on Hendon's arrest, the officers' decision to seek a warrant was prompted by the initial illegal entry into the room. (R. 23 at 3; R. 28 at 1.) Defendant has not objected to the magistrate judge's denial of a Franks hearing. (R. 28 at 2.)

**A.    Probable Cause/Franks Issue**

Evidence obtained pursuant to a search warrant will be suppressed if (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause. E.g., United States v. Dearborn, 873 F.3d 570, 573 (7th Cir. 2017). The court may skip the first two steps if it concludes that probable cause would still have existed if the

5

allegedly false or misleading information is set aside. See, e.g., United States v. Jackson, 103 F.3d 561, 574 (7th Cir. 1996). The magistrate judge followed that course here, finding that the evidence of Hendon's drug trafficking and connection to Room #9 established probable cause to search the room.

I agree with that conclusion. While there is no "categorical rule" that would, in every case, support a finding of probable cause to search a particular location simply because a suspected drug trafficker stays there, United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007), there is a long line of authority in this circuit, cited by the magistrate judge (R. 17 at 7, collecting cases), stating that in "'the case of drug dealers, evidence is likely to be found where the dealers live.'" United States v. Lamon, 930 F.2d 1183, 1188 (7th Cir. 1991) (quoting United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986)); see, e.g., United States v. Sewell, 780 F.3d 839, 846 (7th Cir. 2015); United States v. Jones, 614 F.3d 423, 426 (7th Cir. 2010).

Defendant contends that the affidavit nevertheless must provide some basis for believing contraband will be found at the location, aside from the suspected dealer's residence there. (R. 23 at 4-5.) In Angulo-Lopez, for instance, an informant stated that the defendant was selling heroin out of the residence. 791 F.2d at 1396. In Sewell, agents saw the defendant's suspected drug supplier at the residence. 780 F.3d at 846-47. And in Jones, a transaction occurred in the parking lot of the residence. 614 F.3d at 426. Defendant argues that such linkage is absent here. (R. 23 at 7-8.)

The government "need not provide direct evidence that fruits of the crime or other evidence will be found in the location specified: The magistrate judge 'is entitled to draw reasonable inferences about where evidence is likely to be kept,' and he 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" United

6

States v. Curry, 538 F.3d 718, 729 (7th Cir. 2008) (quoting United States v. Sleet, 54 F.3d 303, 306 (7th Cir. 1995)); see also United States v. Hodge, 246 F.3d 301, 305-07 (3d Cir. 2001) (collecting cases).  Here, the police observed Hendon, a drug trafficking suspect, leave Room #9; Hendon attempted to evade the police when they tried to pull him over; and after he was taken into custody the officers located various quantities of drugs, cash, a firearm, and a scale. The officers also found Hendon in possession of a key for Room #9, and motel personnel told them that Hendon was responsible for that room; this suggests that Hendon was not just a visitor to Room #9 but rather that he controlled that location and intended to return after his disrupted trip.  See United States v. Williams, 974 F.2d 480, 481-82 (4th Cir. 1992) (upholding search of known drug dealer's motel room despite lack of direct evidence that room was used in drug activities).

In United States v. Hoffman, 519 F.3d 672 (7th Cir. 2008), the court found probable cause for a warrant to search the defendant's home where the police observed the defendant leave his home, pulled him over, and found drugs in his car.  The court stated:

> It is true that the presence of narcotics in a defendant's car does not, by itself, establish probable cause to search his home, even if the car is registered to his address. However, participation in drug trafficking activities can create probable cause to search a participant's residence, even without direct evidence that drug-related activity is occurring there, because [i]n the case of drug dealers, evidence is likely to be found where the dealers live. Indeed, the traffic stop and eventual discovery of nearly thirty grams of cocaine in separate baggies would lead an issuing judge to reasonably infer that Hoffman was involved in drug trafficking, and that the activity occurred in his home.

Id. at 676-77 (internal citations and quote marks omitted).

It is true that in Hoffman a recorded call suggested that the defendant may have prepared the drugs in his home before leaving to meet a customer. Id. at 677.  However, there is no indication that this particular fact was dispositive to the court's analysis.  Rather, in

7

determining whether there is a sufficient nexus between the place to be searched and the evidence sought, courts consider all the circumstances, including the strength of the evidence demonstrating that the target is an active drug dealer and the immediacy of his connection to the place to be searched. See United States v. McPhearson, 469 F.3d 518, 524-25 (6th Cir. 2006). Here, the police had clear evidence of Hendon's drug trafficking based on their seizures; this is not a case where the police relied solely on informants. Further, the officers had information closely linking Hendon to Room #9 at the time of those seizures.

The affidavit here also contains information, based on the officer-affiant's training and experience, regarding the habits of drug traffickers and where evidence of their activities is likely to be found. (R. 27-1 ¶¶ 17-27.) In Lamon, the court found that an officer's experience regarding where dealers are likely to hide evidence supported probable cause, even when the police had evidence that the defendant did not sell drugs out of the location to be searched. 930 F.2d at 1190.

Defendant contends that the information included in the affidavit here is boilerplate, nearly identical to an affidavit in another drug trafficking case in this district (R. 23-1; R. 28 at 3), rather than specific to this case. He further contends that the boilerplate presumes a residence, while this case concerned a hotel room, and the officers did not know Hendon lived there. Finally, he contends that the affidavit failed to establish that Hendon fell in the "class" of drug traffickers to which the boilerplate might apply. (R. 23 at 8-11.)

Inclusion of boilerplate about where evidence of drug trafficking is likely to be found is not necessarily inappropriate. See United States v. Aljabari, 626 F.3d 940, 946 (7th Cir. 2010) ("When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of

8

that crime was not or could not have been hidden in that individual's home, a magistrate will generally be justified in finding probable cause to search that individual's home."). In any event, I do not place much weight on the "nexus" section of the affidavit here. The officers had clear evidence connecting Hendon to Room #9, regardless of whether this was his primarily residence, in addition to evidence that he was trafficking a variety of controlled substances at that time.

**B.     Fruit Issue**

Evidence obtained pursuant to a search warrant may also be suppressed as the fruit of a previous, unlawful entry. See Segura v. United States, 468 U.S. 796, 804-05 (1984). In those circumstances, the court asks (1) whether any illegally obtained information affected the judicial officer's decision to issue a warrant, and (2) whether the police officers' decision to seek a warrant was prompted by anything that was discovered during the illegal entry. United States v. Etchin, 614 F.3d 726, 737 (7th Cir. 2010); United States v. Markling, 7 F.3d 1309, 1315-16 (7th Cir. 1993).

As defendant notes, the first part of this inquiry mirrors the Franks analysis, which the magistrate judge conducted. As indicated above, I agree with his analysis. However, the magistrate judge did not address whether the decision to seek the warrant was prompted by anything discovered during the illegal entry into the hotel room. (R. 23 at 12.) To be fair, defendant did not in his motion to suppress ask the magistrate judge to answer this question. Rather, he argued that the police violated his rights in entering the room and that the information they obtained contributed to probable cause for the warrant. (R. 12 at 19-23.) He did not separately argue that the decision to seek the warrant was motivated by what the officers saw.

9

Also unresolved is whether the officers illegally entered in the first place. As defendant acknowledges, while the magistrate judge expressed concerns about the officers' conduct in entering and remaining in the room, he made no specific finding of a Fourth Amendment violation. (R. 23 at 13.)

In the objection briefing, defendant argues that the entry here, accomplished by deception, violated the Fourth Amendment. (R. 23 at 14, citing Pagan-Gonzalez v. Moreno, 919 F.3d 582, 592 (1st Cir. 2019) (stating that "entry . . . acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation" violates the Fourth Amendment) (quoting United States v. Little, 753 F.2d 1420, 1438 (9th Cir. 1984)); United States v. Peters, 153 F.3d 445, 456 (7th Cir. 1998) ("A consensual search is unreasonable under the Fourth Amendment or violative of the due process clause of the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agents.").) He also contends that, after the officers determined Samantha was not there and he asked them to leave, their refusal amounted to an unconstitutional seizure of his person. (R. 23 at 14.)

Defendant further asserts in the objection briefing that the sequence of events suggests that the officers were motivated to seek the warrant based on what they discovered during the illegal entry. After arresting Hendon, the officers did not immediately apply for a warrant to search room #9; rather, they returned to the motel to investigate further, speaking to the two women/informants, gathering information about a second person (defendant) in the room, using a ruse to enter the room, and refusing defendant's requests to leave. After defendant refused consent to search the room, they arrested him; only then did they seek a warrant, and they included in the warrant affidavit information about the informants' claims and defendant's

presence in the room. (R. 23 at 13-15.)

In response, the government argues that the officers did not use a ruse to enter the room; a heroin user named Samantha had previously been arrested with heroin at the motel, and the officers had information suggesting she worked for Hendon. (R. 27 at 8; R. 27-2.) That the officers may have also intended to look for incriminating evidence does not invalidate the search. (R. 27 at 9, citing United States v. Spivey, 861 F.3d 1207, 1215 (11th Cir. 2017) ("Stripped of its subjective purposes, the officers' 'ruse' was a relatively minor deception that created little, if any, coercion.").)

In reply, defendant argues that Samantha's use of heroin at the motel several months previously did not license an entry into the room on this occasion. He further contends that the officers knew, based on a statement from one of the informants, that Samantha was likely not in Room #9 at that time. (R. 28 at 7.) Finally, he contends that the officer's inappropriate joke—"Is somebody yelling for help?"—undermines any notion that this was a legitimate safety check. (R. 28 at 7-8.)

The government further argues in its objection response that, even if defendant's consent was invalid, suppression is not warranted under the independent source doctrine. (R. 27 at 9.) The government states that "the officers did not include in the search warrant affidavit any evidence that they obtained after the warrantless entry into the motel room. And, there is no reason to doubt that officers would have sought the warrant for the motel room regardless of their allegedly illegal contact with the defendant at the door." (R. 27 at 10.)

In reply, defendant notes that the affiant did include information obtained after the entry—the fact that defendant was in the room, that he matched the description given by the informant, and that he was a felon who could not lawfully possess a firearm. (R. 28 at 5-6; R.

27-1 ¶¶ 8, 11.) Defendant further contends that the record contains no evidence or indication that the officers would have otherwise obtained the warrant. (R. 28 at 6-7, citing United States v. Gravens, 129 F.3d 974, 982 (7th Cir. 1997) (applying a preponderance of the evidence standard to the independent source doctrine).)

Finally, the government argues that the officers relied in good faith on the court's decision to issue the warrant. (R. 27 at 11-12, citing United States v. Leon, 468 U.S. 897, 914 (1984).) As defendant notes in reply, however, good faith should not apply when the officers were dishonest or reckless in preparing the warrant affidavit or where the warrant was the fruit of a previous unlawful search. (R. 28 at 8-10.)

It is unclear whether the record is sufficiently developed for the court to address the two remaining issues: (1) whether the police violated defendant's Fourth Amendment rights when they entered and remained in his room; and (2) if so, whether the officers were prompted to seek the warrant based on what they discovered during that illegal entry. I will schedule a status to discuss further proceedings with counsel.

On the first issue, I note that while the voluntariness of consent is determined based on the totality of the circumstances, e.g., Pagan-Gonzalez, 919 F.3d at 591, courts have recognized that two types of deception have an impermissibly coercive effect. First, officers cannot obtain consent by falsely claiming that they have a warrant. Id. at 594 (citing Bumper v. North Carolina, 391 U.S. 543, 550 (1968)). "Second, relying on equivalent reasoning, courts have regularly held that coercion is implicit when officers falsely present a need for urgent action[.]" Id. at 595 (citing, e.g., United States v. Montes-Reyes, 547 F. Supp. 2d 281, 291 (S.D.N.Y. 2008) (finding lack of consent where officers falsely stated they sought entry to hotel room to search for a missing girl, but planned to search for drugs, because police fabricated

12

a "grave emergency")); see also Spivey, 861 F.3d at 1213 ("[W]hen an officer lies about the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries."). On the other hand, courts have indicated that the use of deception may be permissible when the officers have mixed motives for gaining entry. See, e.g., Spivey, 861 F.3d at 1214-15 ("What matters is the existence of a legitimate reason to be there, not the priority that the officers gave that reason.").

In the present case, it is unclear based on the materials before the court why the officers were looking for a "thin white chick" when they returned to the motel. The government has presented a police report indicating that one of the officers involved in this investigation previously encountered Samantha in Room #10 at the motel, apparently using heroin, but it is unknown why the officers wanted to find her on this occasion. Further proceedings may be needed to flesh out the officers' reasons.

On the second issue, the government bears the burden of proof under the inevitable discovery/independent sources doctrines, and it must carry that burden with evidence not merely argument or supposition. United States v. Groce, 255 F. Supp. 2d 936, 945 (E.D. Wis. 2003) (citing United States v. Jones, 72 F.3d 1324, 1334 (7th Cir. 1995)); see also United States v. Marrocco, 578 F.3d 627, 639 (7th Cir. 2009). Because the issue was not previously presented to the magistrate judge and no hearing has been held, the court will inquire if further proceedings are needed on this issue as well.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is adopted in part, as stated herein.

**IT IS FURTHER ORDERED** that this matter is scheduled for counsel-only **STATUS** on **Monday, February 24, 2020, at 2:15 p.m.**

Dated at Milwaukee, Wisconsin, this 14th day of February, 2020.

                                       s/ Lynn Adelman
                                       LYNN ADELMAN
                                       District Judge